| UNITED STATES | IN DISTRICT COURT |
|---|---|
| DISTRICT OF NORTH DAKOTA | SOUTHWESTERN DIVISION |

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 1: 16-CR-31 |
| Plaintiff, ) | |
| vs. ) | |
| ) | **SENTENCING MEMORANDUM** |
| WINDY PANZO, ) | |
| ) | |
| Defendant. ) | |

### I.      Introduction

¶1) Through counsel, Windy Panzo files the following Sentencing Memorandum setting forth factors that the Court is being asked to consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a). With the guideline range being hire than the minimum mandatory sentence, the court can consider the sentencing factors in 18 U.S.C. § 3553(a).

### II.     Sentencing Guidelines

¶2) Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by Booker, requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the Court to tailor the sentence in light of other statutory concerns as well, see § 3553(a). *Booker*, 125 S. Ct. at 757. Thus, under Booker, sentencing courts must treat the guidelines as just one of several sentencing factors set forth in 18 U.S.C. § 3553(a). C. § 3553(a).

¶3) Courts have discretion in determining sentences according to the provisions of 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 259-260 (2005). The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth.

¶4) Section 3553(a)(2) states that such purposes are:

(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) to afford adequate deterrence to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

¶5) In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

(a). The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1));

(b). The kinds of sentences available (§ 3553(a)(3));

(c). The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553(a)(6)); and

(d). The need to provide restitution to any victims of the offense. (§ 3553[a][7]).

Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to "recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added). Under 18 U.S.C. § 3661, no limitation shall be placed on the information concerning the background, character, and conduct of the defendant which a court of the United States may receive and consider for imposing an appropriate

sentence (emphasis added). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as not ordinarily relevant to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. See U.S.S.G. § 5H1. The directives of Booker and § 3553(a) make clear that courts may no longer uncritically apply the guidelines. Such an approach would be inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all the § 3353(a) factors, many of which the guidelines either reject or ignore. *U.S. v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.).

¶6) There are no limitations on the information the Court may consider at sentencing "concerning the background, character, and conduct of a person convicted of an offense." 18 U.S.C. § 3661. 18 U.S.C. § 3553(a) does not direct the Court to give greater weight to some factors over others, and the Court may now consider factors that previously were considered "prohibited factors" or "not ordinarily relevant" under the sentencing guidelines, such as family circumstances, age of the defendant, mental and emotional conditions, physical condition, employment record, and lack of guidance as a youth. *See* U.S.S.G. § 5H1.1- .12 (listing the relevance of certain offender characteristics). See *United States v. Briceno*, No 04-4493, (6th Cir. June 22, 2005). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Pepper v. U.S.*, 131 S. Ct. 1229, 1242-43 (2011). The Court's overarching duty is to "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." *Id.*

¶7) This Court is certainly aware "that in determining the length of the term, imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582. Accordingly, rehabilitative programs can be a justification for a somewhat reduced period of incarceration. 18 U.S.C. § 3621(e) provides a basis for what, in effect, is a reduction in a defendant's sentence for successful completion of the Bureau of Prisons' Residential Drug Abuse Program (RDAP). The Court should be aware that considering BOP Directive 5331.01 concerning "early release," the BOP will not allow Ms. Panzo to participate in the RDAP program because she has been convicted of a "violent offense." BOP Directive 5162.04(6)(3) provides that convictions for any of the subsections of 26 U.S.C. 5861 are "crimes of violence," which automatically exclude participation in the Bureau of Prisons' Residential Drug Abuse Program. Thus, this Court's sentencing determination should not assume eligibility for RDAP and any judicial recommendation for such will be ignored by the BOP.

¶8) Section 3553(a) further provides that the district court should weigh the factors such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentences available;" "the applicable sentencing range;" the articulated policy goals of the guidelines; "the need to provide restitution to any victims of the offense." § 3553(a)(1), (3) -(7).

¶9) In sum, in every case, a sentencing court must now consider all the § 3553(a) factors, not just the guide lines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. And where the guidelines conflict with other sentencing factors set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines. See *U.S. v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires a sentence be no greater than necessary

4

to meet the four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range). Any analysis of a proper sentence must begin with what the accused did to violate the law.

### III.   Application of the Statutory Sentencing Factors to the Facts of this Case

¶ 10) "The power of a government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to their own devices, might well have obeyed the law. Human nature is weak enough and sufficiently beset to temptations without government adding to them and generating crime." <u>Sherman v. U.S.</u>, 356 U.S. 369 (1958). The nature of this quote is the theme of the case before the Court.

¶11) In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Offender.**
    
    a. **Nature and Circumstances of the Offense.**

¶12) On September 29, 2015, the Defendant, Ms. Windy Panzo (hereafter Ms. Panzo) was stopped for a traffic violation by Special Agent Rob Fontenot (SA Fontenot) and Special Agent Holding Eagle (SA Holding Eagle). During this traffic stop, some marijuana and marijuana paraphernalia was seized from the passengers of Ms. Panzo's car (one in the passenger seat and two in the rear of the vehicle). No arrests were made during this traffic stop, only a verbal warning was issued to Ms. Panzo.

¶13) On October 1, 2015, Ms. Panzo signed a Confidential Informant Agreement under SA Holding Eagle and SA Fontenot and began work as a Confidential Informant for the Bureau of Criminal Investigation. Ms. Panzo, after being confronted by SA Fontenot about the potential for a position as a confidential informant, volunteered for the position willingly. The only reason that Ms. Panzo was involved with drug traffickers was to pursue her mission of saving and protecting the children being exploited and trafficked. Ms. Panzo was clear and persistent of her intentions as a confidential informant. However, SA Fontenot was not interested in her child exploitation pursuits. SA Fontenot made it clear he was only interested in the drugs for now and after Ms. Panzo brought down the drug dealers, he would address the child trafficking. Ms. Panzo was promised that not only would she be helping the children, but also once she joined "Team America," anything she told SA Fontenot was in confidence, and law enforcement would protect her. Ms. Panzo was under the understanding that SA Fontenot would be protecting her and relocating her when her time as a confidential informant was over. As a volunteer informant, Ms. Panzo would not have participated as a confidential informant had she known that protection and relocation were not guaranteed. It should be noted that throughout this case, Ms. Panzo was under the impression that SA Fontenot was her supervising officer and she did not interact with any other officer until after she was arrested. The United States claims that her supervising officer was another man, SA Holding Eagle.

¶14) Ms. Panzo was utilized as a confidential informant for SA Fontenot on numerous occasions. Once, SA Fontenot and Ms. Panzo met on September 29, 2015, the phone conversations between the two indicate that they were in constant contact. Many times, SA Fontenot and Ms. Panzo spoke multiple times in a 24-hour period. Based on this information, Ms. Panzo had a very open and consistent line of communication with SA Fontenot. The success

that SA Fontenot had in arrests related to work the Ms. Panzo did is directly correlated to the open, constant line of communication between Ms. Panzo and SA Fontenot.

¶15) On October 12, 2015, Ms. Panzo was the operator of a motor vehicle stopped for a traffic violation. Ms. Panzo, as a contracted confidential informant, was allegedly in possession of 18 grams of methamphetamine, a scale, and $575. However, the Report and Notice of Seized Assets completed by SA Fontenot and dated October 12, 2015 only listed the $575 as a seized asset. (Report and Notice of Seized Assets dated October 12, 2015). At this stop, Ms. Panzo was merely issued a verbal warning. Despite the United States' argument that this was not conduct directed by law enforcement, the buy conducted by Ms. Panzo was documented and inventoried by Southwest task force. Furthermore, after the October 12, 2015 buy, Ms. Panzo was given $1,200 to cover the expenses of the purchased controlled substances. The conduct by Ms. Panzo as a confidential informant on October 12, 2015 is alleged at Count Two on the indictment.

¶16) October 13, 2015, Ms. Panzo was utilized as a confidential informant in a controlled buy with Greg Davis. The transaction was for 3 ounces of methamphetamine for $1,600 per ounce totaling $4,800. The transaction was outside the scope of any criminal wrongdoing.

¶17) On October 14, 2015, Ms. Panzo conducted another controlled buy, this time with John Roberts. Ms. Panzo was not familiar with the identity of John Roberts and only knew him as someone named "Panama." The conduct between Ms. Panzo and "Panama" was done under the direction of law enforcement.

¶18) On October 15, 2015, Ms. Panzo was interviewed by law enforcement at which time she admitted to received approximately 1-1.25 ounces of methamphetamine per day. And initially, when asked about how much Methamphetamine she had purchased from "Panama,"

Ms. Panzo stated 10-12 ounces. SA Fontenot, who was present at the interview, his presence made Ms. Panzo feel pressured into stating that she had purchased approximately 50 pounds of methamphetamine. During the interview, Ms. Panzo also informed SA Holding Eagle and SA Fontenot that "Panama" would soon be introducing her to his partner, Boyd Dale Padgett. It should also be noted that in John Roberts proffer agreement, he has admitted to only ten (10) pounds of methamphetamine. As the kingpin of the operation, it seems John Roberts weight should be greater than that of Windy Panzo, who was a "runner" for John Roberts.

¶19) On October 21, 2015, Ms. Panzo was the operator of a vehicle stopped for a traffic violation. Before the stop, Ms. Panzo was attempting to do a drug transfer to SA Fontenot. At the time of the stop, Ms. Panzo was answering an incoming phone call from Mr. Davis. The call came in before Ms. Panzo could make a phone call to SA Fontenot to tell him about the drugs and the firearm. During the stop, Ms. Panzo admitted that there were both drugs and a firearm in the vehicle. A search of the vehicle yielded an uncertain number of bags containing a crystalized substance. The evidence report and the police report documenting the October 21, 2015 stop display a contradictory number of bags seized, 3 on one report and 5 on another report. SA Fontenot signed both reports. The stop also yielded 2 cell phones, a 9mm firearm and a pay/owe type sheet. However, the pay/owe sheet was not in Ms. Panzo's handwriting and she has no knowledge of the identity of the names on the seized pay/owe sheet. Ms. Panzo's actions, while still contracted as a confidential informant, from this incident are encompassed in Counts Four, Five, and Six in the Indictment.

¶20) Prior to signing the Confidential Informant Agreement, Ms. Panzo thought she was under the protection of law enforcement. Ms. Panzo agreed to sign the Confidential Informant Agreement with the understanding that she would be protected and relocated once her

cooperation was fulfilled. Ms. Panzo was told by SA Fotenot, "If they front you dope, guns, whatever, don't worry about it, just call me." This statement was made as the result of Ms. Panzo being utilized in controlled transactions for SA Fontenot's investigation. On October 21, 2015, after SA Fontenot made the previous statement, Ms. Panzo was "fronted" some methamphetamine and a firearm. Before Ms. Panzo could complete a call to SA Fontenot, her exact directions, she was pulled over.

¶21) October 22, 2015, Panzo was utilized as a confidential informant to purchase methamphetamine from Padgett at his hotel in Beach, ND. After the transaction, law enforcement executed a search warrant on Padgett and Robert's hotel rooms. No criminal conduct is alleged against Panzo from October 22, 2015. The successful controlled buy on October 22, 2015 was conducted less than 24 hours after Ms. Panzo is charged for acting outside the bounds of her confidential informant agreement. If the conduct of Ms. Panzo was so outside of her duties as a confidential informant on October 21, it is unlikely law enforcement would turn around, less than 24-hours later and trust her with another high profile controlled buy.

¶22) Prior to her arrest, Ms. Panzo attempted to file a formal complaint against SA Fontenot with the States' Attorney's Office. The visit resulted in a brief conversation between SA Fontenot and his supervisor, but no formal reprimand was conducted. The following day, November 24, 2015, Ms. Panzo received a phone call from SA Fontenot and was later arrested.

¶23) Following her arrest, Ms. Panzo was interviewed by Special Agent Brandon Stockie with the Bureau of Criminal Investigation. During that interview, Ms. Panzo admitted to signing up to work as a confidential informant on her own accord. Ms. Panzo was interested in becoming a confidential informant in continuance with her child exploitation investigation that she had begun prior to law enforcement involvement.

9

¶24) The credibility of SA Fontenot as a trustworthy member of criminal law enforcement is critical as a mitigating circumstance to the Defendant's sentence. SA Fontenot made a variety of statements to both Ms. Panzo and Kasey Franklin, Ms. Panzo's fiancé. An inability to follow the responsibilities associated with working with confidential informants is at issue in this case. SA Fontenot's actions as a law enforcement officer involving Ms. Panzo is questionable, at a minimum. Therefore, his ability to be truthful and credible are relevant to all charges indicated in the plea agreement and should be considered by the Court when sentencing the Defendant.

¶25) Windy L. Panzo has plead guilty to Counts One, Two, Four, and Six. Count One, Conspiracy to Deliver 500 grams of Methamphetamine Mixture, alleges that from in or about the summer of 2015 through the date of indictment, in the District Court of North Dakota, the Defendant participated in the distribution of between 15 and 45 kilograms of a mixture of a detectable amount of methamphetamine and collecting drug proceeds. Count Two and Four, Possession with Intent to deliver Methamphetamine, alleges that on October 12, 2015 and October 21, 2015, in the District of North Dakota, the Defendant knowingly and intentionally distributed a mixture of a substance containing a detectable amount of methamphetamine. This was in violation of N.D.C.C. § 19-03.1-23 and constitutes a Class AA Felony. Count Six, Felon in Possession of a Firearm, alleges that on October 21, 2015, in the District of North Dakota, the Defendant having been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm, a Jennings 9mm handgun.

¶26) Ms. Panzo was listed on a lengthy indictment with several individuals. However, none of those individuals mentioned Ms. Panzo in their discovery and many of them were offered proffers. Despite all of Ms. Panzo's cooperation with government as a volunteer

confidential informant, the Defendant was never offered a proffer or 5K1 agreement from the government. Ms. Panzo was the first on the indictment to want to proffer, but was deemed untruthful and unreliable. It should be noted that, Ms. Panzo's codefendants gave the same information and were offered proffer agreements. Thus proving, that Ms. Panzo's statements were truthful and reliable. As apparent from the facts of this case, John Roberts was one of the kingpins of this drug operation. Mr. Roberts, who had previously held a gun to Ms. Panzo, sold a significant amount of drugs, and was a key player in the human trafficking ring, received a proffer and will only serve 10 years. Ms. Panzo helped law enforcement take down John Roberts, Dale Padgett, Arrah Lane, Shelli Harper, Greg Davis, Shanunique Ruffin, and Dwayne Taylor. This was significant participation in a government investigation and required difficult and dangerous cooperation. Even with Ms. Panzo's extensive cooperation, she was not given the opportunity to proffer.

### b. History and Characteristics of Ms. Panzo

¶27) The principles underlying Defendant Windy Panzo's history and character are suggested from testimony from the Defendant, the Defendant's daughter, and the law enforcement officers Ms. Panzo worked with before they decided to indict her. The Defendant has an extensive history working as an advocate for the child exploitation and human trafficking.

¶28) Windy Panzo, is originally from Oakland, California, but has also lived in Hawaii, Oregon and Arizona. Ms. Panzo moved to Hawaii in 1989 to get away from the backlash associated with the murder of her Godfather, Michael the Irishman, a member of the Hells Angels Motorcycle Club (MC). Ms. Panzo continued working with the Hells Angels MC following the death of her biological father, who was also a member of the Hells Angels MC. Ms. Panzo's mother is also deceased. As a child, Ms. Panzo found her mother hanging from the

ceiling committing suicide. In an attempt to save her mother's life, Ms. Panzo stood underneath her mother's dangling dead body, trying to hold her weight, until her father got home. Ms. Panzo had two brothers, one has passed away and other is being held in federal prison as a sex offender. Ms. Panzo has two daughters, one of which she keeps in contact with, however, this case has made contact less frequent.

¶29) Ms. Panzo had a trying childhood. Ms. Panzo began drinking alcohol at age eight, smoking marijuana at age twelve, smoking methamphetamine at age twelve, and inhaling cocaine at age thirteen. Ms. Panzo was arrested for the first time at age 12. This detrimentally affected Ms. Panzo's life in school, work, and home. However, despite these setbacks, Ms. Panzo has attended some secondary education at a community college in Hawaii and at the University of Phoenix. Ms. Panzo has plans to further her education.

¶30) Currently, Ms. Panzo receives social security for Post-Traumatic Stress Disorder, Anxiety and Night Terrors. These disorders coincide with Ms. Panzo's graphic past. Furthermore, Ms. Panzo is a breast cancer survivor.

¶31) In 2014, Ms. Panzo acted as a Confidential Informant. This exemplifies a consistent dedication to preventing and ending Human Trafficking/Child Exploitation. Ms. Panzo has a passion for the cause. In addition, this previous confidential informant agreement shows a loyalty to justice and an ability to work collaboratively with law enforcement. The evidence of this past informant arrangement shows Ms. Panzo's ability to follow the duties and responsibilities of a confidential informant agreement.

¶32) While in Hawaii, Ms. Panzo founded and operated the non-profit E. Komo Mai, which advocated against domestic violence. Ms. Panzo has been dedicated to preventing violence throughout her entire life.

¶34) Ms. Panzo's dedication to protecting children is evident based on her actions while in Arizona. Ms. Panzo thwarted a murder for hire plot in 2013. Ms. Panzo befriended a fellow inmate to gain information about an attempted murder on a child and three adults. After acquiring this information, Ms. Panzo alerted jail officials, who then took action. Ms. Panzo stopped the potential murder of an innocent child and asked for nothing in return. Ms. Panzo stated "I couldn't let a little boy die". Ms. Panzo did not receive a reduced sentence and never once asked for anything in return. Ms. Panzo's was in danger of retaliation, so much so, that she was relocated from the general population of the prison. Ms. Panzo stated "she would do it all again to save a child's life".

¶33) Ms. Panzo moved to North Dakota in 2015 with her fiancé, Casey Franklin. In North Dakota, Ms. Panzo continued to advocate against violence and more specifically against child exploitation/human trafficking. According to the law enforcement officers Ms. Panzo worked with, she was a credible and useful informant that the government utilized on multiple occasions. Based on the Defendant's life experiences and history, working as an informant without reliable law enforcement was incredibly dangerous and has, on many occasions, made the Defendant fearful for her life and the lives of her family members, specifically, her fiancé, Casey Franklin.

> 2. **The Need for the Sentence Impose to Promote Certain Statutory Objectives:**
>
>> **(a) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense,**

13

      **(b) to afford adequate deterrence to criminal conduct,**

      **(c) to protect the public from further crimes of the defendant, and**

      **(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

¶34) **(a).** The punishment, if for the above listed reasons, should be considered in light of the extraordinary extent to which she has mitigated the offenses by helping law enforcement catch an arrest several big drug dealers in the area, including John Roberts, Dale Padggett, and Greg Davis. The Defendant made it possible for law enforcement to conduct controlled buys with multiple drug dealers and this would not have been so easily accessible but for the aid of the Defendant. While the offenses committed are high level, serious offenses, the severity of the risks and dangers the Defendant experienced while aiding law enforcement should mitigate the sentence in creating a "just" punishment for the offense. Defendant also chose to take on these risks as a volunteer informant for the government. She was not attempting to work off offenses or rid herself of criminal liability. Defendant was passionate for the cause of helping law enforcement.

¶35) **(b).** Deterrence of criminal conduct is a weak argument for the punishment of Defendant's actions. The Defendant, under a Confidential Informant Agreement, was working cooperatively with the government. Furthermore, the Defendant based her actions on protecting and saving children that had become part of a child trafficking arena. Throughout the Defendant's work with the police, her primary goal and forefront of all her actions was advocating for the children subject to human trafficking. The law enforcement Defendant was working with disregarded these intentions. Deterrence is irrelevant in this case.

¶36) **(c).** Defendant is thoroughly afraid of her wellbeing and the wellbeing of her family. She wants to get away and start over fresh. The Defendant is uninterested in this life

style and was only involved in these charges because of her passion for the children in the human trafficking case and her successful work with law enforcement previously in Arizona. Protection of the public from further crimes of the defendant would not seem to be an issue.

¶37) **(d).** The fourth statutory objective of sentencing, providing the offender with needed training, treatment, or care, is directly related to the Defendant's admitted drug addiction. The defendant would benefit from drug treatment, which could be a consideration in a determination to shorten the Defendant's sentence.

### 3. The Kinds of Sentences Available

¶38) In *Booker*, the Supreme Court severed and excised 18 U.S.C § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *Booker*, 125 S.Ct. at 756. This renders the sentencing guidelines advisory. *Id.* 18 U.S.C. § 3551.

### IV.   Conclusion

¶39) For the foregoing reasons, Defendant, Windy Panzo, respectfully submits that a sentence not a day higher than the mandatory minimum of ten years is more than sufficient, and in fact is greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a). Furthermore, Windy Panzo requests that the Court recommend to the Bureau of Prisons that she be assigned to a prison near her daughter in Idaho, because it is in relatively easy reach for visitation by her daughter and because Ms. Panzo would like to be away from the North Dakota area for her safety and the safety of her family.

Dated this 4 day of May, 2017

**Blake Hankey (ND Bar ID# 06094)**
Hankey Law
405 Bruce Ave Ste. 100
Phone No.: (701) 751-6200
Fax No.: (701) 746-4729
bhankeylaw@gmail.com
Attorney for Defendant